# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | Case No. 1:18CR00025 |
| v. ) | |
| ) | **OPINION AND ORDER** |
| ) | |
| **SHAWN WAYNE FARRIS, ET AL.,** ) | By: James P. Jones |
| ) | United States District Judge |
| Defendants. ) | |

*S. Cagle Juhan, Assistant United States Attorney, Abingdon, Virginia, for United States; Don M. Williams, Jr., Williams Law Office, PLC, Pennington Gap, Virginia, for Defendant James Robert Johnson; Correy A. Diviney, Strickland, Diviney & Segura, Roanoke, Virginia, for Defendant Larry Levi Bennett; Patrick J. Kenney, Law Office of Patrick J. Kenney, PLC, Roanoke, Virginia, for Defendant Donald Shane Hawthorne; Neil A. Horn, Neil Horn PC, Roanoke, Virginia, for Defendant Bradley Scott Williams.*

In this multi-defendant drug conspiracy case, four defendants have objected to being sentenced according to the U.S. Sentencing Guidelines Manual's advisory sentencing ranges for "ice" methamphetamine, a higher-purity methamphetamine. The defendants contend that they should instead be sentenced according to the guidelines for methamphetamine mixtures that are less pure. They argue that the government has not shown that it was reasonably foreseeable to them that the conspiracy involved ice methamphetamine. Alternatively, they contend that I should reject on policy grounds the guidelines' higher sentencing ranges for ice methamphetamine. In this opinion, I resolve these objections.

I.

In 2017, law enforcement became aware of a drug trafficking organization ("DTO") led by Shawn Wayne Farris, that was transporting and distributing methamphetamine from California to southwest Virginia and northeast Tennessee. On October 24, 2018, a grand jury of this court returned an Indictment charging Farris and 27 other defendants in Count One with conspiring to distribute and possess with the intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a), (b)(1)(A)(viii), 846.

At present, 16 of the defendants have entered into plea agreements in which they stipulate that they were involved in the distribution of ice methamphetamine. However, the four defendants at issue here — James Robert Johnson, Larry Levi Bennett, Donald Shane Hawthorne, and Bradley Scott Williams — pleaded guilty to Count One without plea agreements and have made no stipulations as to the purity of the methamphetamine with which they were involved.

The Presentence Investigation Report ("PSR") prepared for each of these defendants states that "[w]hile all of the methamphetamine involved in this conspiracy was crystal methamphetamine, also known as 'Ice,' it will simply be referred to as methamphetamine throughout this report." See, e.g., PSR for James Robert Johnson 4, ECF No. 614. The PSRs and the evidence presented at each

sentencing hearing also show the following facts regarding each defendant's individual involvement in the DTO as relevant to the present issues.

## A. James Robert Johnson.

In March of 2016, a confidential source reported to law enforcement that she had used methamphetamine belonging to Johnson and she had also obtained a total of 20 grams of methamphetamine from him. In addition, a search of an unindicted coconspirator's cell phone in June of 2016 revealed text messages with Johnson, in which the coconspirator had ordered methamphetamine from Johnson on multiple occasions.

In March of 2017, a confidential source reported to law enforcement that she had been selling methamphetamine for the past two years and Johnson had been her source until August of 2016. She also reported that Andrea Stickel, another defendant in this case, had been Johnson's source. In November of 2017, another confidential source told law enforcement that Johnson distributed methamphetamine, and she had observed him obtaining it from Stickel. Stickel was previously involved in a relationship with Johnson and they distributed methamphetamine together.

███████████,[1] a defendant in this case, told law enforcement that

---

[1] An unredacted version of this Opinion and Order is filed under seal and provided to counsel.

Johnson had supplied him with methamphetamine. ███████████, another of Johnson's codefendants, told law enforcement that Stickel and Johnson had sold methamphetamine every week between January 2015 and March 2018, and he, Johnson, and Stickel had all been supplied methamphetamine by Farris, the leader of the DTO. Stickel, ████, and ██████ have all stipulated in their plea agreements that their guideline range should be calculated with respect to ice methamphetamine. Stickel Plea Agreement 4, ECF No. 285; ████ Plea Agreement 3, ECF No. ██; ██████ Plea Agreement 3, ECF No. ██. DEA laboratory reports of drugs seized from 10 of Johnson's coconspirators (other than Stickel, ████, and ██████) were introduced, and showed that the drugs had purity levels greater than 80%. Gov't Ex. 2, ECF No. 634.

Following his arrest, Johnson told law enforcement officers that he had obtained 3.5 to 28.25 grams of methamphetamine "a couple of times a week for two years," indicating between 364 to 2,948 grams in total. PSR ¶ 147, ECF No. 614.

An ATF special agent, Justin Masuhr, testified at Johnson's sentencing that most of the methamphetamine now discovered by law enforcement is of ice purity and is imported from Mexico, and "more generally preferred" in this geographical area. Homemade methamphetamine, of a lesser purity, is "almost to zero now."

The PSR determined that based upon Johnson's involvement with coconspirators Farris, Stickel, ██████, and ████, Johnson should be held

accountable for a drug weight of at least 4.5 kilograms of ice methamphetamine. PSR ¶ 148, ECF No. 614. Based upon that drug weight, Johnson would have a Base Offense Level of 38. With a Total Offense Level of 35, and a Criminal History Category of II, his sentencing range would be 188 to 235 months imprisonment. If I sustained Johnson's objection to the attribution of ice purity, his Base Offense Level would be 32, and the sentencing range would be 97 to 121 months imprisonment.[2]

### B. Larry Levi Bennett.

On December 8, 2016, law enforcement conducted a controlled purchase of seven grams of methamphetamine from Bennett. A DEA laboratory analyzed the purchased methamphetamine and found that it was not ice methamphetamine but rather was a less pure methamphetamine mixture.[3]

---

[2] While Johnson is not entitled to a reduction under the current "safety valve" two-level reduction of the Sentencing Guidelines, USSG § 2D1.1(b)(18), he does meet the criteria of the statutory changes to the mandatory minimum safety valve statute, 18 U.S.C. § 3553(f)(1), contained in the First Step Act of 2018, Pub. L. No. 115-391, § 402(a)(1)(B), 132 Stat. 5194, 5221 (2018), and regardless of resolution of the present quantity and purity objections, a downward variance of two levels may be appropriate in Johnson's case. Because the Sentencing Commission is without a quorum, it has been unable to consider a guideline amendment to track the change in the statute.

[3] The DEA's chemical analysis report on the methamphetamine is attached as an exhibit to Bennett's Sentencing Memorandum and Motion for Downward Variance, ECF No. 571.

During a February 2017 traffic stop of a vehicle in which Bennett was a passenger, an unindicted coconspirator threw a bag of methamphetamine from the vehicle. A search of the vehicle yielded additional methamphetamine and drug paraphernalia. On February 24, 2017, Bennett was arrested and found to be in possession of a grinder that contained residue that tested positive for methamphetamine. Bennett admitted that he owned the methamphetamine.

In January and February of 2017, confidential sources told law enforcement that Bennett was being supplied with or purchasing methamphetamine. In April of 2017, a source reported that Bennett was distributing methamphetamine and provided to law enforcement a photo of Bennett holding a piece of methamphetamine that appeared to be approximately six inches long and two inches wide.[4]

In June of 2017, another confidential source told law enforcement that she had been receiving methamphetamine from Shawn Wayne Farris, the leader of the DTO, every day since early 2017, and she had given almost all of this methamphetamine to Bennett, who then sold it.

---

[4] In its conventional form, methamphetamine is a powder that can be snorted, ingested, or injected. Once processed, and usually smoked, it is called "ice" because "it resembles rock candy or a chip of ice." Narconon, *Methamphetamine and Ice Drug Info*, https://www.narconon.org/drug-information/methamphetamine-ice.html (last visited Oct. 8, 2019).

███████████████, a defendant in this case, and Bennett's primary supplier, testified before the grand jury that she had received 13 pounds of methamphetamine from Farris. She in turn fronted the drugs to Bennett and his girlfriend, Crystal Pharis, for distribution. In her Plea Agreement, ███████ stipulated that she should be sentenced based on ice methamphetamine. Plea Agreement 3, ECF No. ███. ███████ testified before the grand jury that Bennett ended up owing her and in turn Shawn Wayne Farris $49,000 for methamphetamine fronted to him.

The government introduced at Bennett's sentencing hearing the same 10 certificates of analysis from his codefendant's cases, showing methamphetamine purity above 80%, although none of the certificates were from drugs possessed by Bennett. In addition, Chris Parks, a task force officer with the DEA for eight years, testified as to the popularity in this geographical region of ice methamphetamine, imported from Mexico, because it is stronger and cheaper than the powder form.

The PSR determined that Bennett should be held accountable for a drug weight of at least 4.5 kilograms of ice methamphetamine. PSR ¶ 320, ECF No. 579. Based upon that drug weight, Bennett would have a Base Offense Level of 38. With a Total Offense Level of 35, and a Criminal History Category of IV, his sentencing range would be 235 to 293 months imprisonment. If I sustained Bennett's objection

to the attribution of ice purity, his Base Offense Level would be 32, and the sentencing range would be 121 to 151 months imprisonment.

### C. Donald Shane Hawthorne.

In March of 2018, law enforcement officers interviewed ███████, a defendant in this case, and ███████ reported that Hawthorne had been making trips to Georgia to obtain methamphetamine, possibly from ███████████. In her grand jury testimony, ███████ stated that she had sold methamphetamine to Hawthorne. In October of 2018, codefendant ███████ advised law enforcement officers that she and Hawthorne had provided methamphetamine to each other. ███████, ███████, and ███ each stipulated in their plea agreements that they had been involved in distributing ice methamphetamine. ███████ Plea Agreement 3, ECF No. ██; ███████ Plea Agreement 3, ECF No. ██; ███ Plea Agreement 4, ECF No. ██.

At Hawthorne's sentencing hearing, Todd Brewer, a special agent with the DEA for 21 years, testified that that he had long experience in investigating the trafficking of methamphetamine. He explained that the ice form of the drug is the most readily available in southwest Virginia and northeast Tennessee and has been for the last five years. He estimated that 99% of drug users prefer ice because they can stay high on it for longer period of time. It is made in "super labs" in Mexico and because of the resulting volume produced, is cheaper for consumers. He related

that the street price in the local geographical area for ice methamphetamine has gone in the past five or six years from $2,400 per ounce to $400 to $500 per ounce.

The PSR determined that Hawthorne should be held accountable for a drug weight of at least 500 grams of ice methamphetamine. PSR ¶ 215, ECF No. 652. Based upon that drug weight, Hawthorne would have a Base Offense Level of 34. With a Total Offense Level of 31, and a Criminal History Category of V, his sentencing range would be 168 to 210 months imprisonment. If I sustained Hawthorne's objection to the attribution of ice purity, his Base Offense Level would be 30, and the sentencing range would be 120 to 150 months imprisonment.

D. Bradley Scott Williams.

On September 11 and 12, 2017, Williams and DTO leader Farris exchanged text messages in which Williams gave Farris an address, to which Farris sent a package of methamphetamine. Farris told Williams that he had included boxes in the package so Williams could send money to Farris once he had sold the methamphetamine.

On September 19, 2017, Williams was arrested and found to be in possession of methamphetamine and $4,400 in United States currency. DEA analysis of the 59.72 grams of methamphetamine seized when Williams was arrested revealed that it was ice methamphetamine. A confidential source advised law enforcement that Williams had obtained the methamphetamine from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, a

defendant in this case, and the source had been with Williams when he delivered methamphetamine for ▮.

In an interview with law enforcement, ▮ stated that Farris supplied methamphetamine to her and Williams, and she had introduced Williams to Farris. In a later proffer, ▮ stated that she had both purchased methamphetamine from and sold it to Williams.

On March 13, 2018, law enforcement interviewed an unindicted coconspirator, who reported that Williams had received shipments of methamphetamine from Farris. The coconspirator also stated that Williams had obtained methamphetamine from Devon Coleman, another defendant in this case.

▮, another of Williams' codefendants, reported that she had obtained methamphetamine from Williams. ▮ and ▮ both stipulated in their plea agreements that they had been involved in distributing ice methamphetamine. ▮ Plea Agreement 4, ECF No. ▮; ▮ Plea Agreement 4, ECF No. ▮.

The PSR determined that Williams should be held accountable for a drug weight of at least 1.5 grams of ice methamphetamine. PSR ¶ 312, ECF No. 564. Based upon that drug weight, Johnson would have a Base Offense Level of 36. With a Total Offense Level of 33, and a Criminal History Category of VI, his sentencing range would be 235 to 293 months imprisonment. If I sustained Williams' objection

to the attribution of ice purity, his Base Offense Level would be 32, and the sentencing range would be 151 to 188 months imprisonment.

II.

In light of the probation office's conclusion that all of the methamphetamine involved in the conspiracy was ice methamphetamine, each defendant's PSR recommended that he be sentenced according to the U.S. Sentencing Guidelines Manual's guidelines for ice methamphetamine. At each individual sentencing hearing, the defendant accordingly objected to the calculation in his PSR of the Base Offense Level, based on the attribution of ice methamphetamine. I heard evidence and argument at each hearing and took each ice methamphetamine objection under advisement.[5]

A defendant objecting at sentencing to the facts set forth in the PSR has an affirmative duty to show that the information in the report is unreliable. *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990). The defendant must articulate why the facts contained in the reports are untrue or inaccurate. *Id.* A mere objection is insufficient. *Id.* Without an affirmative showing that the information is inaccurate, the court is "free to adopt the findings of the presentence report without

---

[5] Some of the defendants have also objected to other aspects of their PSRs, but I do not address those objections here.

- 11 -

more specific inquiry or explanation." *Id.* (internal quotation marks, citation, and alterations omitted).

For drug crimes, a defendant's Base Offense Level is calculated according to the Drug Quantity Table in the United States Sentencing Guidelines Manual ("USSG"). USSG § 2D1.1(c). The Drug Quantity Table establishes a graduated scale of base offense levels that correspond to the type and quantity of drugs involved. With respect to methamphetamine, the table refers to three types of that drug, which differ based on their relative purity level. *Id.* at § 2D1.1(c), Notes to Drug Quantity Table (B)–(C). At issue here are the Base Offense Levels that correspond to a mixture containing a detectable amount of methamphetamine, and "ice," which refers to a mixture that is at least 80% pure methamphetamine.[6] *Id.* The guidelines establish a 10:1 ratio in their treatment of methamphetamine mixture and ice methamphetamine. *Id.* at § 2D1.1(c). For example, a defendant convicted of a crime involving five kilograms of methamphetamine mixture will have the same offense level as one convicted of a crime involving 500 grams of ice methamphetamine. Thus, whether a defendant is held accountable for methamphetamine mixture or ice methamphetamine makes a significant difference

---

[6] The third type of methamphetamine, "methamphetamine (actual)," refers to the actual methamphetamine contained in a mixture, and it is treated the same as ice methamphetamine in the Drug Quantity Table. USSG § 2D1.1(c), Notes to Drug Quantity Table (B).

in the defendant's Base Offense Level and resulting advisory sentencing guideline range.

In the case of jointly undertaken criminal activity, a defendant's Base Offense Level may be determined on the basis of all the reasonably foreseeable acts of other persons in furtherance of the jointly undertaken criminal activity. USSG § 1B1.3(a)(1)(B). In the context of a drug trafficking conspiracy, this means that a defendant's Base Offense Level may be determined on the basis of drugs distributed or possessed by coconspirators in furtherance of the conspiracy. *See United States v. Gadison*, 8 F.3d 186, 196–97 (5th Cir. 1993). The crucial factual issues are (1) whether the activity of the coconspirator was within the scope of the defendant's agreement of participation in the joint criminal activity and (2) whether the other activity was reasonably foreseeable to the defendant. *See United States v. Gilliam*, 987 F.2d 1009, 1012–13 (4th Cir. 1993). Before holding a defendant responsible for the acts of other coconspirators, the court must make particularized factual findings on both the scope of the defendant's agreement and the foreseeability of his or her coconspirator's conduct. *United States v. White*, 77 F. App'x 678, 682 (4th Cir. 2003) (unpublished). In doing so, the court may "'consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its

probable accuracy.'" *United States v. Uwaeme*, 975 F.2d 1016, 1021 (4th Cir. 1992) (quoting U.S.S.G. § 6A1.3(a)) (internal alterations omitted).

III.

Following the procedures outlined above, I find that the government has proved by the greater weight of the evidence that the defendants here should be held attributable under the advisory guidelines for ice methamphetamine and thus their Base Offense Levels should reflect that attribution.

While the government was unable to produce a chemical analysis of any drug distributed or possessed by the defendants that had the purity of ice methamphetamine, the evidence as a whole, both circumstantial and direct, indicates that the conspiracy itself was centered on ice methamphetamine and that the defendants knew or reasonably should have known of that fact. A number of their coconspirators, including those who directly dealt with the defendants, have agreed through their plea agreements and other statements that ice methamphetamine was the drug involved. The testimony at the sentencing hearings established, without any contradiction, that ice methamphetamine is the drug of choice for users — and thus providers — in the region in which the conspiracy operated. Indeed, it appears that this is true across the country. "The average purity of all methamphetamine in the United States is greater than 90 percent — and has been since 2011 — according to the DEA." *United States v. Pereda*, No. 18-cr-00228-CMA, 2019 WL 463027, at

\*3 (D. Colo. Feb. 6, 2019) (citing U.S. Dep't of Justice, Drug Enforcement Admin., *2017 National Drug Threat Assessment,* 67–70 (2017), https://www.dea.gov/sites/default/files/2018-07/DIR-040-17_2017-NDTA.pdf).

It is true that there was a chemical analysis of seven grams of the drug sold by defendant Bennett to an undercover agent, showing a purity of less than 80%. But that does not balance the other evidence of the nature of the conspiracy, regardless of whether on that one occasion, Bennett sold a less pure form of the drug.

All of the defendants have pleaded guilty to participating in the single conspiracy charged. The evidence shows that ice methamphetamine was central to that conspiracy.

### IV.

The [Supreme] Court has made clear that the Guidelines are to be the sentencing court's "starting point and . . . initial benchmark." Federal courts understand that they "'must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.'" The Guidelines are "the framework for sentencing" and "anchor . . . the district court's discretion."

*Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345 (2016) (internal citations omitted).[7]

---

[7] The Sentencing Guidelines have remained largely outcome determinative in federal sentencing, in spite of their advisory nature since *United States v. Booker*, 543 U.S. 220, 264 (2005). *See* Frank O. Bowman, III, *Dead Law Walking: The Surprising Tenacity of the Federal Sentencing Guidelines,* 51 Hous. L. Rev. 1227, 1268–70 (2014).

It is argued by the defendants that the court should categorically reject the ice methamphetamine guidelines ranges in these cases "based on a policy disagreement with those Guidelines." *Spears v. United States*, 555 U.S. 261, 265–66 (2009). I decline to do so.

A number of district courts have refused to adopt the ice methamphetamine sentencing ranges on policy grounds. *United States v. Moreno*, No. 5:19CR002, 2019 WL 3557889, at *3 n.4 (W.D. Va. Aug. 5, 2019) (citing cases). The reasons by these courts include the following: (1) the methamphetamine guidelines are not empirically based, but are derived from the statutory mandatory minimum sentences for methamphetamine offenses; (2) purity is no longer an accurate indicator of a defendant's culpability, since most currently distributed methamphetamine is at or above the 80% level and thus the assumption is unwarranted that those distributing drugs that are not diluted or "cut" are higher in the distribution chain; and (3) there is an unjust disparity between the guidelines for ice methamphetamine and other dangerous drugs, such as heroin. *Id.* at *3–4.[8]

While I fully recognize my discretion to categorically disagree with the Sentencing Guidelines on policy grounds, *see Spears,* 555 U.S. at 264, I believe that

---

[8] There is also a middle-of-the-road approach, refusing to categorically reject the methamphetamine guidelines, but recognizing that because of doubts as to the purity disparity, considering them "only loosely advisory." *United States v. Swanson*, No. 2:18-cr-00294-BLW, 2019 WL 3761629, at *4 (D. Idaho Aug. 7, 2019).

there are legitimate reasons to respect the present guidelines, understanding the court's duty to always consider both downward departures and variances in the individual case.

In the first place, "[t]hat a district judge . . . may be permitted to deviate from the guidelines based on a policy disagreement with the Sentencing Commission . . . does not mean that the judge is required to do so." *United States v. Campos*, 724 F. App'x 279, 280 (4th Cir. 2018) (unpublished) (quoting *United States v. Munjak*, 669 F.3d 906, 907 (8th Cir. 2012)). In *Campos,* the Fourth Circuit held that it was not error for the district judge to reject the argument that there was an unwarranted disparity in the guidelines between high- and low-purity methamphetamine. The district judge reasoned there that a higher purity level may be accounted for in sentencing, because it represents the work of a more sophisticated organization. 724 F. App'x at 280; *see also United States v. Trejo*, 624 F. App'x 709, 714 (11th Cir. 2015) (unpublished) (holding that district court did not err in refusing to exercise its discretion to reject on policy grounds the methamphetamine guidelines); *United States v. Kort,* 440 F. App'x 678, 683–85 (10th Cir. 2011) (unpublished) (finding sentence proper even though district court declined to disregard higher ice methamphetamine guidelines).

It is beyond dispute that methamphetamine is a highly destructive drug. That is this court's long experience and is recognized by experts. "In some areas of the

there are legitimate reasons to respect the present guidelines, understanding the court's duty to always consider both downward departures and variances in the individual case.

In the first place, "[t]hat a district judge . . . may be permitted to deviate from the guidelines based on a policy disagreement with the Sentencing Commission . . . does not mean that the judge is required to do so." *United States v. Campos*, 724 F. App'x 279, 280 (4th Cir. 2018) (unpublished) (quoting *United States v. Munjak*, 669 F.3d 906, 907 (8th Cir. 2012)). In *Campos,* the Fourth Circuit held that it was not error for the district judge to reject the argument that there was an unwarranted disparity in the guidelines between high- and low-purity methamphetamine. The district judge reasoned there that a higher purity level may be accounted for in sentencing, because it represents the work of a more sophisticated organization. 724 F. App'x at 280; *see also United States v. Trejo*, 624 F. App'x 709, 714 (11th Cir. 2015) (unpublished) (holding that district court did not err in refusing to exercise its discretion to reject on policy grounds the methamphetamine guidelines); *United States v. Kort,* 440 F. App'x 678, 683–85 (10th Cir. 2011) (unpublished) (finding sentence proper even though district court declined to disregard higher ice methamphetamine guidelines).

It is beyond dispute that methamphetamine is a highly destructive drug. That is this court's long experience and is recognized by experts. "In some areas of the

country, it poses an even greater threat than opioids, and it is the drug that most contributes to violent crime. . . . It remains one of the most commonly misused stimulant drugs in the world." Nat'l Inst. on Drug Abuse, *Methamphetamine Overview* (April 2019), https://www.drugabuse.gov/ publications/research-reports/methamphetamine/overview (last visited Oct. 8, 2019). Moreover, "[b]eyond its devastating effects on individual health, methamphetamine misuse threatens whole communities, causing new waves of crime, unemployment, child neglect or abuse, and other social ills." *Id.*

It is thus not inappropriate for the Sentencing Guidelines to treat higher purity methamphetamine more seriously, in light of its increased popularity, its more profound effect on the user, and its connection with international crime syndicates. Accordingly, I will overrule the defendants' objections to the application of the methamphetamine guidelines.

It is so **ORDERED**.

ENTER: October 9, 2019

/s/ *James P. Jones*
United States District Judge